## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIC HAYWOOD,                          )
                                       )
            Plaintiff,                 )
        v.                             )        2:07cv0554
                                       )        **Electronic Filing**
MICHAEL J. ASTRUE,                     )
COMMISSIONER OF SOCIAL                 )
SECURITY,                             )
                                       )
            Defendant.                 )

## MEMORANDUM OPINION

## I.    INTRODUCTION

Plaintiff, Eric L. Haywood, ("Plaintiff" or "Haywood") brings this action pursuant to 42 U.S.C. § 405(g) seeking review of the final determination of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The parties have filed cross-motions for summary judgment, and the record has been developed at the administrative proceedings. For the reasons set forth below, Plaintiff's motion will be granted, the Commissioner's motion will be denied and the case will be remanded to the Commissioner with direction to grant benefits consistent with an onset date of May 13, 2002.

## II.   PROCEDURAL HISTORY

Plaintiff filed an application for DIB benefits on September 15, 2004, alleging an onset date of September 22, 1997 due to a gunshot wound to his leg and back disorders. R. 61-62. On January 3, 2005, Plaintiff timely filed a written request for a hearing, after his initial claim was denied on November 12, 2004. R. 41-42, 47.[1] On July 19, 2006, Plaintiff appeared with counsel before Administrative Law Judge ("ALJ") Kenneth R. Andrews, and both Plaintiff and vocational expert, Mary Beth Kopar ("VE Kopar"), testified.

---

[1] R. refers to the administrative transcript.

On October 27, 2006, the ALJ denied Plaintiff's claim under the five–step sequential analysis used to determine disability. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since September 22, 1997. R. 17. The ALJ determined at step two that Plaintiff had the following severe impairments: disorders of the back (discogenic and degenerative) and a gunshot wound to the leg. Id. At step three, the ALJ determined that Plaintiff's impairments did not meet any of the criteria set forth in 20 C.F.R. §§ 404, Subpart P, Appendix 1, Regulation No. 4. Id. The ALJ concluded, at step four, that Plaintiff has the residual functional capacity (RFC) to perform sedentary work requiring standing and/or walking for at least two hours, sitting for about six hours, a thirty-minute sit/stand option and lifting up to a maximum of ten pounds and five pounds repeatedly. R. 18. At step five, the ALJ determined that although Plaintiff is not able to perform his past relevant work, he is able to perform jobs in the national economy such as surveillance system monitor. R. 22.

After the denial, Plaintiff requested a review of the ALJ's decision which the Appeals Council denied on March 1, 2007. Thus, the ALJ's decision became the final decision of the Commissioner. Sims v. Apfel, 530 U.S. 103, 106-07 (2000). Plaintiff then filed the instant action seeking judicial review of the Commissioner's final decision. The matter is now before this Court on the cross-motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

## III.    STATEMENT OF THE CASE

Plaintiff was born on October 21, 1963. R. 347. He was 43 years at the time of the hearing and considered to be a younger individual as defined in 20 C.F.R. § 404.1563. Id. He has obtained his General Equivalency Diploma (G.E.D.). R. 348. Plaintiff worked as a farm laborer, which was classified as heavy and unskilled. R. 21, 348-349, 363. He also has worked as a groundskeeper, which is medium and unskilled. Id. As a farm laborer, his duties primarily included doing farm work, cutting grass, harvesting crops, milking cows, and lifting feed sacks and hay bales. R. 75-76, 348-349.

The ALJ initially dealt with the issue of the date last insured and concluded that Plaintiff's earnings showed that he had obtained coverage to remain insured through December

31, 2002.  R. 15, 346.  Thus, disability had to be established on or before that date (the relevant period).

Plaintiff's medical records for the relevant period are extensive.  The roots of Haywood's injuries stem from a 1977 leg injury in a hunting accident and a 1989 injury to the lumbar spine sustained while working.  R. 74-75.  When Plaintiff was fourteen years old, a 16–gauge double–barrel shotgun was discharged into his knee and the growth plate of his right leg.  R. 74. He subsequently underwent eleven surgeries to repair his leg.  Id.

Plaintiff met with Dr. Richard B. Kasdan ("Kasdan") in 1989 who diagnosed Plaintiff with a large right-sided herniation at L5-S1.  R. 103.  Dr. Kasdan referred Plaintiff to Dr. Peter E. Sheptak ("Sheptak") who performed a microdiscectomy and laminectomy in February 1990.  R. 74, 103.  Plaintiff reported to Dr. Kasdan that the surgery went well.  R. 103.  He returned to work as a laborer in April 1990, initially starting with light duty work before returning to his previous workload.  R. 75, 103.

On October 7, 1991, Plaintiff met with Dr. Sheptak who noted that Plaintiff's physical therapy sessions along with his injection therapy were giving Plaintiff some relief.  R. 340. Plaintiff did not have any significant leg symptoms, his lumbosacral incision had healed, his straight leg raises were negative bilaterally, and his motor, sensory and reflex exams were within normal limits.  Id.  He did note that Plaintiff's back motion was limited.  Id.  He recommended that Plaintiff return to work with light duty status.  Id.  From 1991 to 1997, Plaintiff was placed on light and medium duty restrictions.  R. 75.  Although he continued to experience pain, he was able to bear it and continue to work.  R. 119.

In the latter half of 1997, Plaintiff began to experience increasing pain in his lower back, right buttock, and right leg and he eventually stopped working.  R. 103.  Plaintiff's primary care physician, Dr. James Campagna ("Campagna"), performed a lumbar magnetic resolution imaging test ("MRI") which revealed an epidural scar around the thecal sac at the L5–S1 area, spondvlolisthesis in the same area and anterior herniation with  neural, foraminal narrowing.  R. 119.  The MRI also revealed degenerative changes at the L4–L5 region with a mild bilateral neural foraminal narrowing.  Id.  Dr. Campagna prescribed Prednisone for his back pain which

only provided temporary relief.  Id.  Dr. Campagna referred Plaintiff to Dr. Kasdan for treatment of his back pain on October 9, 1997.  R. 103.

Dr. Kasdan reported Plaintiff as moving slowly, with a slight restriction of back motion in all directions.  Id  Plaintiff could not lift his buttock from a table while lying on his back and raising his leg.  Id.  The surgical wound from Plaintiff's knee surgery produced proximal atrophy. Id.  Plaintiff did not have any other focal weakness in his legs nor were there any signs of Babinski's reflex.[2]  For three weeks, Plaintiff received physical therapy in the form of exercises, heat massage and ultrasound.  R. 119.  He also continued to use Soma and Vicodin ES for pain when needed.  R. 120.  Dr. Kasdan recommended an epidural block to be administered to the L5-S1 area and referred Plaintiff to Dr. Rajindar K. Wadhwa ("Wadhwa").  R. 103-104, 120.

On October 30, 1997, Plaintiff presented to Dr. Wadhwa with numbness, tingling, throbbing and burning sensations in his lower extremities.  R. 119.  Dr. Wadhwa also noted that Plaintiff moved extremely slowly, walked with an antalgic gait and was restricted in lumbar movement.  R. 120.  Plaintiff could squat and return to an upright position and do a heel/toe walk, albeit with difficulty.  Id.  Dr. Wadhwa diagnosed Plaintiff with failed back syndrome.  Id. Plaintiff was given the epidural block and a program for relaxation exercises which Dr. Wadhwa reported went well.  Id.  Dr. Wadhwa also recommended swimming and walking along with the continuation of physical therapy.  Id.  Plaintiff was also to discontinue the use of VicodinES and start using Darvocet and Neurontin three times a day.  Id.  Plaintiff also saw Dr. Wadhwa on December 9, 1997, after undergoing knee debridement, and stated that the physical therapy was helping and proving beneficial to breaking the pain cycle, leading to "definite improvement."  R. 116.  Dr. Wadhwa noted that Plaintiff "was quite happy with his progress."  Id.

On March 9, 1998, Plaintiff completed a physical work performance evaluation conducted by physical therapist, Mark A. Kerestan.  R. 181-188.  He participated in all twenty tasks.  R. 181-188.  Plaintiff's underlying limitation factors were low back pain and right knee

---

[2]  Babinski's reflex is an infantile reflex (disappears after two years of age and the nervous system has developed) that if observed in adults, indicates damage has occurred in the nerve paths that connect the spinal cord and the brain.  Definition of Babinski's reflex.  MedlinePlus.  < http://www.nlm.nih.gov/medlineplus/ency/article/003294.htm>

pain.  R. 182.  Therapist Kerestan concluded plaintiff was able to sustain the light level of work for an eight-hour day.  R. 188.

On June 15, 1999, Plaintiff met with Dr. Sheptak who noted the "extensive conservative management" of Plaintiff's injuries and pain (physical therapy, nerve blocks and medication), none of which had provided much relief to him.  R. 338.  Dr. Sheptak did however note that Plaintiff was able to so some minor household chores and went for walks.  Id.  He also observed Plaintiff's antalgic gait.  Id.  Plaintiff's straight leg raise was negative on the right side, his "motor function was intact bilaterally with no obvious weakness except for minor changes secondary to his previous right chronic leg problem."  Id.  The sensory exam showed the right leg to be normal while the left leg (in the foot and calf) had some patchy sensory changes.  Id.  Plaintiff also had a limited range of motion in his back in all directions.  Id.  Dr. Sheptak reviewed the results from Plaintiff's lumbar MRI, noting the epidural scar at the L5-S1 region.  There was no evidence of recurring herniated disc that would compromise any nerve roots.  R. 339.  Dr. Sheptak recommended Plaintiff be evaluated by a multi-disciplinary pain clinic for better pain control.  Id.  He indicated Plaintiff would not be a good candidate for another surgery.  Id.

Plaintiff met with Dr. Michael A. Tranovich ("Tranovich") on November 16, 2001.  R. 310.  Dr. Tranovich observed that Plaintiff's straight leg raising was marginally positive at seventy degrees, there was no significant flexion deformity and the x-rays were "unremarkable for gross bony changes."  Id.  Plaintiff did have tenderness over his trochanter and groin with his passive range of motion mildly affected.  Id.

Dr. Ricardo Marinelli ("Marinelli"), of the Institute for Pain Medicine, treated Plaintiff periodically between May 2000 and May 2002.  Treatments included epidural steroid, nerve root block and trigger point injections.  R. 249-306.  In November 2000, Dr. Marinelli observed that Plaintiff was able to ambulate but still had an antalgic gait.  R. 283.  Plaintiff could extend ten to fifteen degrees before experiencing lower back pain in his left side.  Id.  Plaintiff's straight leg raise in seated and supine positions was negative bilaterally.  Id.  In March 2001, Plaintiff

complained of an aching and throbbing pain that was localized in the lower left back area which had not been helped by previous sacroiliac joint injections. R. 281.

In March 2001, Dr. Marinelli observed that Plaintiff was experiencing some beneficial effects from the lumbar epidural steroid injections although the effect did not last long and the relief provided was minor. R. 281-282. Additionally, the use of the interferential stimulation unit provided some relief, especially with the deeper muscles in his lower back albeit temporarily as the pain returned within a relatively short time. Id. Consequently, Dr. Marinelli recommended that Plaintiff undergo a provocative discography. Id. Dr. Marinelli performed the discography in May 2002. R. 249-250.

On May 24, 2001, Plaintiff informed Dr. Marinelli of an improvement in his left lower extremity and the effect of physical therapy in strengthening his overall conditioning. R. 280. Dr. Marinelli recommended that Plaintiff continue with the physical therapy due to Plaintiff's "encouraged improvement with the strengthening and the conditioning." Id.

In July 2002, Dr. Marinelli administered a nerve root block injection in the left L5 region. R. 259. Dr. Marinelli noted that Plaintiff tolerated the procedure well and he had significant improvement with his left-sided symptoms. Id. On July 19, 2001, Dr. Marinelli noted that Plaintiff's overall improvements with his pain continued although concern remained in regards to his left lower back, buttock and groin area. R. 276.

On August 30, 2002, Plaintiff indicated that he would like to decrease the use of and dependency on some of his medications to reduce the gastroesophageal discomfort he felt was a result of the medications. R. 257. Dr. Marinelli advised Plaintiff of the repercussion of reducing his medication as he was "likely to experience further exacerbation of his pain complaints." Id. Dr. Marinelli noted that Plaintiff's L3-4 levels exhibited mild degenerative disc disease; however there was no protrusion or any foraminal impingement. Id. At the L5-S1 level, there was severe degenerative disc disease but no thecal sac compression. Id. Plaintiff was able to rise from a seated to standing position albeit with a mild to moderate degree of discomfort due to his lower back pain and his leg symptoms. R. 256. Plaintiff's left lower extremity strength was 4+/5, his right lower extremity muscle strength was 5/5 and his patellar and Achilles deep tendon reflexes

6

were 2/2 bilaterally.  Id.  His straight leg raise was bilaterally negative.  Id.  In October 2002,

Plaintiff underwent a left lumbar facet joint nerve block which yielded minimal improvement.  R.

255.

Plaintiff also met with Dr. David S. Buck ("Buck") who performed an MRI of Plaintiff's

hips on November 20, 2001.  The MRI results showed that Plaintiff's hips maintained alignment.

R. 241.  The soft tissue surrounding his hip and the pelvic structures were unremarkable.  Id.

There was a small amount of joint fluid bilaterally which Dr. Buck stated was within normal

limits.  Id.  There was a small bone island in the intertrochanteric region of Plaintiff's left hip but

there were no fractures present.  Id.

Plaintiff also saw Dr. Buck on January 4, 2002.  R. 240.  Dr. Buck observed that Plaintiff

suffered from "severe degenerative change" at the L5-S1 region with anterolisthesis of the L5 on

the S1.  Id.  He reported epidural scarring, which did not compress the thecal sac or appear to

involve "definite nerve roots."  Id.  Plaintiff had severe foraminal narrowing at the left side while

it was moderate on the right side.  Id.

Plaintiff continued to receive treatment after the relevant period in time.  In April 2003,

an MRI of Plaintiff's left hip was negative.  R. 311.  On August 18, 2003, Dr. Victor Thomas

("Thomas") conducted an Independent Medical Re-Evaluation.  R. 312-315.  Dr. Thomas

referred to his previous Independent Medical Evaluation of May 13, 2002, in which he opined

that Plaintiff was disabled and suffered from a post discectomy syndrome, induced by Plaintiff's

August 1989 injury.  R. 313.  He recommended that Plaintiff obtain an L5-S1 fusion since there

was evidence of severe narrowing of the L5-S1 disc along with a slight spondylolisthesis.  Id.

Dr. Thomas noted that Plaintiff had not followed Drs. Marinelli's and Campagna's

recommendations that he utilize a spinal cord stimulator or obtain surgery from neurosurgeons

and orthopaedic surgeons.  Id.  He also indicated that Plaintiff has done very little to try any of

the options to get himself better.  R. 314.

Dr. Thomas stated that Plaintiff informed him that he was not feeling any different from

his last visit with Dr. Thomas in May 2002.  Id.  Plaintiff continued to use medication prescribed

by Dr. Campagna although he had stopped seeing Dr. Marinelli.  Id.  Dr. Thomas observed that

Plaintiff was able to sit through the history-taking portion of the examination, although he leaned towards the left while sitting. Id. Unlike the frequent jerking or "spasming" at the May 2002 examination, Plaintiff did not exhibit any of these symptoms during the August 2003 examination. Id. Plaintiff was able to drive himself to the examination (a thirty-minute trip). Id. Straight leg raising was positive on the left and negative on the right. Id. Dr. Thomas concluded that Plaintiff was disabled and once again, recommended that Plaintiff obtain an L5–S1 spinal fusion. Id.

On October 24, 2003, Dr. W. Timothy Ward ("Ward") met with Plaintiff and observed that he had a normal gait with the straight leg raising sign negative bilaterally. R. 318. He also noted that his motor, sensory and reflex examinations were normal with both lower extremities. Id. Dr. Ward recommended that Plaintiff be seen in a pain clinic and obtain a dorsal column stimulator. Id.

On January 28, 2004, Dr. Buck conducted an MRI of Plaintiff's lumbar spine. R. 321. He noted that there were no changes from Plaintiff's examination on January 3, 2002 which showed anterolisthesis (spondylolisthesis) of the L5-S1 region with moderate right side neural foraminal narrowing and marked left side neural foraminal narrowing. Id. There was a small enhancement along the epidural space indicating a small amount of scarring. Id.

On March 10, 2004, Plaintiff met with Dr. John J. Mossy ("Mossy") of the Department of Neurological Surgery at the University of Pittsburgh Physicians. R. 320. Dr. Mossy indicated that Plaintiff would made a good candidate for the placement of the spinal cord stimulator for his lower back and leg pain. Id.

On February 2, 2005, Dr. Lawrence B. Haddad ("Haddad") saw Plaintiff for emotional and physical problems. R. 341-342. Dr. Haddad observed Plaintiff's "significant gait disturbance", use of a cane, and problems with sitting in and getting up from a chair. Id. Dr. Haddad diagnosed Plaintiff with major depression with marked anxiety and persistent, severe pain problems. Id. He opined that Plaintiff had concentration and attention problems, had withdrawn socially, made negative self–statements, and exhibited a dysphoric mood with attitudes of hopelessness, helplessness and fleeting suicidal thoughts. Id. Dr. Haddad stated that

8

Plaintiff would not be able to perform activities within a schedule or attend to tasks from beginning to end that would require "sustaining a routine, or performing at a consistent pace." Id. Dr. Haddad concluded that Plaintiff would not be able to perform any substantial gainful activity. R. 342.

## IV.    STANDARD OF REVIEW

The Social Security Administration ("SSA"), acting pursuant to its rulemaking authority under 42 U.S.C. § 405(a), has developed a five- step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act.  The United States Supreme Court recently summarized this process as follows:

> If at any step a finding of disability or non–disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity."  [20 C.F.R.] §§ 404.1520(b), 416.920(b).  At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  §§ 404.1520(c), 416.920(c).  At step three, the agency determined whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimants age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

Barnhart v. Thomas, 540 U.S. 20, 24- 25 (2003)(footnotes omitted).

This Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994).  The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record.  Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986).  Congress has expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"  42 U.S.C. §

405(g).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Pierce v. Underwood, 487 U.S. 552, 565 (1988).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve–month period."  Stunkard v. Secretary of Health and Human Services, 841 F.2d 57, 59 (3d Cir. 1988); 42 U.S.C. § 423(d)(1).  A claimant is considered to be unable to engage in substantial gainful activity "only if (her) physical or mental impairment or impairments are of such severity that (she) is not only unable to do his previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To support his ultimate findings, an ALJ must do more than state factual conclusions.  He must make specific findings of fact.  Stewart v. Secretary of HEW, 714 F.2d 287, 290 (3d Cir. 1983). The ALJ must consider all medical evidence contained in the record and must provide adequate explanations for disregarding or rejecting evidence.  Weir on Behalf of Weir v. Heckler, 734 F.2d 955, 961 (3d Cir. 1984); Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981).  This includes crediting or discounting a claimant's complaints of pain and/or subjective description of the limitations caused by his or her impairments.  Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983).  As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently."  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

"Overall, the substantial evidence standard is a deferential standard of review."  Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).  But where a review of the entire record reveals that the Commissioner's decision is not supported by substantial evidence, the court has an obligation to reverse the decision and remand with direction to grant benefits or conduct further

proceedings.  Podedworney v. Harris, 745 F.2d 210, 221 (3d Cir. 1984).  A remand with direction to grant benefits is appropriate only when substantial evidence on the record as a whole indicates the claimant is disabled and entitled to benefits.  Id. at 221-22.

## V.    DISCUSSION

In concluding that plaintiff could sustain various forms of sedentary work through the end of his insured period, the ALJ emphasized that plaintiff had obtained varying degrees of relief throughout the relevant period of time.  Plaintiff had reported relief for his left-sided symptoms from the nerve block injections from Dr. Marinelli as well as some relief from the various epidural injections that had been administered.  The ALJ further reasoned that plaintiff had reported various forms of improvement from physical therapy that occurred from 1997 through 2001.  Particularly, in 1997 plaintiff had reported that physical therapy was breaking the pain cycle and providing definite improvement.  And in 1999 there was no evidence of recurring herniated disc or compression on the thecal sac.  The ALJ thus reasoned that plaintiff had experienced improvement with various forms of treatment and further opined that there was no objective medical evidence to support plaintiff's subjective complaints of pain.

The issue is whether substantial evidence supported the ALJ's findings and conclusions. See Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 118 (3d Cir. 2000) (the task of the reviewing court is "to determine whether there is substantial evidence on the record to support the ALJ's decision").  Here, the record lacks substantial evidence to support the ALJ's findings and conclusions that Plaintiff retained the residual functional capacity to perform to perform full-time sedentary work requiring standing and/or walking for at least two hours, sitting for about six hours, a thirty–minute sit/stand option and lifting up to a maximum of ten pounds and five pounds repeatedly.  To the contrary, the substantial evidence shows only that plaintiff suffers from two severe impairments that have produced chronic pain which has worsened over time.  Despite consistent efforts to treat and control plaintiff's pain, the deteriorating nature of

plaintiff's back impairment has precluded the ability to keep his pain syndrome within limits that would permit physical activity consistent with the demands of substantial gainful employment. And while there was substantial evidence to support the ALJ's discounting of plaintiff's reports of disabling pain and resulting limitations through a fair portion of the time period in question, it is clear that as of the spring of 2002 the record supports only the view that plaintiff was disabled from all forms of gainful activity. Consequently, the ALJ's decision will be reversed and the matter will be remanded with direction to grant benefits consistent with an onset date of May 13, 2002.

It is unequivocally clear that the ALJ improperly discounted the overwhelming evidence by plaintiff's treating sources reflecting the significant and consistent disabling limitations caused by the progression of his impairments. Where a treating source's opinion on the nature and severity of claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence of record, the treating source's opinion is to be given "controlling weight." Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001); accord Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) ("A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports with great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'") (quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)). And even where the record contains some evidence which can be construed as inconsistent with a treating source's opinion, treating physicians' opinions are to be accorded great weight, "especially when their opinion 'reflects expert judgment based upon continuing observation of the patient's condition over a prolonged period of time.'" Allen v. Bowen, 881 F.2d 37, 41 (3d Cir. 1989) (quoting Podedworny, 745 F.2d at 217-18.

Furthermore, reports from consulting physicians who have examined the claimant and

rendered assessments on conditions within their respective area of expertise are to be given appropriate evidentiary weight, which will vary based on the circumstances and the other medical evidence presented. Gordils v. Secretary of Health and Human Services, 921 F.3d 327, 328 (1st Cir. 1990) (citing Rodriguez v. Secretary of Health and Human Services, 647 F.2d 218, 223 (1st Cir. 1981) (weight to be afforded a consulting/examining physician's report "will vary with the circumstances, including the nature of the illness and the information provided the expert."). For example, where the consulting/examining physician's report constitutes the only probative medical evidence on the condition in question, it may be entitled to great or even controlling weight. See Reid v. Chater, 71 F.3d 372, 374 (10th Cir. 1995) (examining physician's report accorded significant weight where it was only medical assessment on point and corroborated by other evidence). Similarly, examining physician's reports that rest on objective clinical test results may be entitled to significant or controlling weight. See Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).

The ALJ reviewed the medical opinions of Plaintiff's treating sources but failed to accord the proper weight to their examining reports. Plaintiff met with Dr. Sheptak in June 1999 who observed that although Plaintiff was able to so some minor household chores and go for walks, he was unable to do any extensive type of activity and his activity level was very limited due to discomfort. R. 326. Sheptak noted that Plaintiff had undergone an extensive, conservative regimen which included physical therapy, medications, and nerve blocks, none of which had given Plaintiff much relief. Id. Although the nerve blocks did provide moderate relief, the effect of the physical therapy had subsided as his functional level had plateaued. Id. It was noted that at that point in time it was unlikely that additional physical therapy would provide plaintiff with any further relief. Id. Sheptak observed that Plaintiff walked with an abnormal gait and his back motion was limited to a moderate degree in all directions due to lower grade spasm and tenderness. Sheptak felt that Plaintiff would not be a good candidate for another surgery and

ultimately recommended that Plaintiff go to a multi-disciplinary pain clinic for better pain control.

Dr. Marinelli also noted the absence of sustained relief for Plaintiff's pain.  In March 2001, Marinelli noted that although Plaintiff received some beneficial effects from the lumbar epidural steroid injections, this relief was minor and did not last very long.  R. 281-282. Similarly, the use of an interferential stimulation unit also gave Plaintiff some relief, particularly with the deeper muscles in his lower back; this relief, however, only lasted for a short period of time.  Id.  Plaintiff was able to ambulate but he still had an antalgic gait.  R. 281.  Marinelli recommended Plaintiff undergo a provocative discography which was done in May 2002.  R. 259.

Plaintiff met with Dr. Thomas on August 18, 2003 who performed an Independent Medical Re-Evaluation.  312-314.  Thomas opined that Plaintiff's status had not changed from when he saw Plaintiff for the original Independent Medical Evaluation in May 13, 2002.  Thomas noted that in May of 2002 Plaintiff suffered from a post discectomy syndrome stemming from his original injury in August of 1989.  Plaintiff had displayed jerking or "spasming".  Thomas did not believe that "any further conventional surgery such as a discectomy would be appropriate" and had advised Plaintiff against further injections "as these ha[d] not been of any benefit in the past, either permanent or temporary relief."  R. 314.  Thomas concluded that Plaintiff was disabled and recommended an L5-S1 spinal fusion since there was a severe narrowing of the L5-S1 disc along with a spondylolisthesis.

Plaintiff's pain was well observed and documented in the medical records.  While there was some temporary improvement from various modalities of treatment in years prior to 2000, there was overwhelming evidence of plaintiff's chronic pain thereafter.  Each treating specialist recognized and accepted the chronic and significant degree of plaintiff's pain syndrome and explored multiple ways to provide plaintiff with relief.  Each noted the readily apparent

14

limitations from plaintiff's impairments such as the presence of plaintiff's gait disturbance and his difficulty in doing simple activities such as walking, getting up from a seated position and flexion of the spine. Each noted the inability to provide plaintiff with any long term abatement of his pain. No treating or examining physician questioned the bases for plaintiff's pain or its chronic nature. The deterioration from plaintiff's degenerative back condition and the progression of the foraminal narrowing to the point where it was severe on the lift side and moderate on the right is clearly documented through clinical test results. Independent medical evaluations in May of 2002 and August of 2003 confirmed that plaintiff's impairments and the resulting limitations precluded him from engaging in any form of substantial activity as of May of 2002.

The above body of evidence as a whole reflects that the treating and consulting physicians recognized the progression of the limitations from plaintiff's impairments and their ultimate disabling effects. There was virtually no medical evidence from treating or consulting sources to the contrary.[3] Under such circumstances it was error for the ALJ to ignore the import of this body of evidence and draw adverse inferences and conclusions.

Against this backdrop it was also error for the ALJ to discount plaintiff's testimony reflecting disabling limitations. The Act recognizes that under certain circumstances pain in itself may be disabling:

> [a]n individual's statement as to pain or other symptoms shall alone not be conclusive evidence of disability ...; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that result from anatomical, physiological or psychological abnormalities which could

---

[3]Dr. Ward's report was not to the contrary. Although straight-leg testing and plaintiff's gait was reported as normal on the day of examination, the purpose for the brief one-day examination/consultation was to determine whether plaintiff should pursue surgical fusion. Dr. Ward did not question the chronic nature of plaintiff's pain syndrome. He simply opined that plaintiff was not a good candidate for such a procedure and advised that plaintiff should be followed in a pain clinic. R. 318.

> reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under disability.

42 U.S.C. § 423 (d)(5)(A); Green v. Schweiker, 749 F.2d 1066 (3d Cir. 1984). The United States Court of Appeals for the Third Circuit has set forth a four-prong standard to be used by district courts when reviewing assessments of the Commissioner concerning subjective pain: (1) subjective complaints of pain are to be seriously considered, even where not fully confirmed by objective medical evidence; (2) subjective pain may support a claim for disability benefits and may be disabling; (3) when such complaints are supported by medical evidence, they should be given great weight; and finally, (4) where the claimant's testimony as to pain is reasonably supported by medical evidence, the ALJ may not discount the pain without contrary medical evidence. Ferguson v. Schweiker, 765 F.2d 31 (3d Cir. 1985).

The record contained numerous clinical and objective medical findings documenting conditions that could produce chronic pain and objective test results documenting plaintiff's experience of pain. Plaintiff had a severe herniated disk which required surgical intervention. That surgery produced a scar around the thecal sac at L5-S1. Although plaintiff did experience improvement from the surgery, he attempted to return to heavy manual labour – a well documented predictor for poor surgical outcome. See The Merck Manual, 18th ed. (2006) at 328. In addition, plaintiff was diagnosed with both degenerative disc disease in the lumbar region and spondylosis, or osteoarthitic spine disease, both of which are known to cause chronic low back pain which can radiate into the buttocks and leg. See Harrison's Principles of Internal Medicine, 17th ed. (2008) at 110-112. He also suffers from spondylolisthesis, a condition known to cause pain and abnormal gait. Id. at 109. Underlying osteoarthritis can be a contributing factor to this

16

condition. The Merk Manual at 329.   One on the most common locations for the condition is the L5-S1 vertebra.  Harrison's Principles of Internal Medicine at 110-112.  Spondylolisthesis at that location is known to cause sciatica, which produces symptoms of pain, sometimes severe, in the low back and radiating from the buttocks into the leg.  The Merck Manual at 327.   Test results lending credence to plaintiff's complaints of pain included the MRIs showing severe degenerative changes, progressive neural foraminal narrowing, numerous positive straight-leg raising tests, and abnormal gait. See e.g.  Harrison's Principles of Internal Medicine at 115, Professional Guide to Diseases, 17th ed. (2001) at 601; The Merck Manual at 327-29.

Against this backdrop the ALJ's determination that there was no medical evidence to support plaintiff's complaints of pain was nothing more than rank speculation.  Furthermore, it is well settled that such an unsupported lay opinion cannot provide substantial evidence to uphold a disability determination.   See  Morales, 225 F.3d at 318 (an ALJ may not reject the import of medical evidence as a whole based upon inference formed from lay speculation); see also Walton v. Halter, 243 F.3d 703, 709-10 (3d Cir. 2001) (ALJ may not ignore evidence and draw adverse inferences having no substantial support in the record); Burnett, 220 F.3d at 122 ("an ALJ may not make speculative conclusions without supporting evidence").

Moreover, as explained above, the record contained consist medical documentation reflecting the chronic pain produced by plaintiff's impairments.  The treating and consulting physicians did not doubt its existence or question its sources.  Radiological testing confirmed the progressive deterioration of plaintiff's failed back surgery and its resulting complications in the L5-S1 area.  Plaintiff's gait disturbance was noted on numerous occasions.  The limiting effects from plaintiff's impairments were repeatedly recorded. Plaintiff's testimony was remarkably consistent with the grounds upon which the treating and examining physicians determined appropriate courses of treatment and rendered their assessments and opinions.  In short, there were well documented sources for plaintiff's pain and no treating or consulting sources suggested

in even the slightest way his complaints were without a correlating medical condition that could be expected to produce such pain and limitations. Indeed, when Plaintiff indicated he wanted to decrease his use of and dependency on some of his medications to reduce the gastroesophageal discomfort he was experiencing, Dr. Marinelli cautioned Plaintiff against that and warned him of the likelihood of "further exacerbati[ng] . . . his pain complaints." R. 257. Because there were medical bases for plaintiff's complaints and the treating sources did not doubt the existence of Plaintiff's pain, the ALJ erred in failing to accord proper weight to this aspect of the record. See Stewart v. Sullivan, 881 F.2d 740 (9th Cir. 1989) (it is error to reject consistent evidence of excess pain on the ground that it is not supported by objective medical findings where there is medical evidence to support the existence of some pain); Ferguson v. Schweiker, 765 F.2d 31 (3d Cir. 1985) (where claimant's testimony as to pain reasonably is supported by medical evidence, the ALJ may not discount the pain without contrary medical evidence; and where the complaints are supported by medical evidence, they are to be given great weight).

In addition, there was no evidence which suggested that Plaintiff engaged in any activities of daily living or social functioning which were inconsistent with the limitations described by Plaintiff. The ALJ noted that Plaintiff's activities of daily living were not markedly limited and Plaintiff had experienced some improvements in his status to the point of engaging in swimming. R. 20. There is no substantial evidence to support this observation. Plaintiff had previously met with Dr. Wadhwa on October 30, 1997, who had recommended swimming as an addition to Plaintiff's physical therapy regime. R. 120. There is simply no evidence in the record to indicate Plaintiff had followed through with this recommendation.

Plaintiff indicated that his wife had to help him with bathing and dressing. R. 88. He has difficulty completing tasks such as preparing food or cooking, using a vacuum cleaner or doing housework and repairs. R. 89. He has to take rests between activities and the extent of completion normally depends on the level of pain he is experiencing. He has had to stop

engaging in any of his old hobbies such as biking, travelling, bowling, and hunting. R. 90, 353.
He is constantly fidgeting and is able to lift and carry modest amounts of weight for brief periods
of time and then only until pain and fatigue cause him to stop. R. 92. Medication only provides
temporary relief and he has to contend with the varied side effects of his medications. R. 93.

Plaintiff further testified that he only uses the first floor so as to avoid using the steps; the
bedroom used to be on the second floor but was moved to the first floor to accommodate
Plaintiff. R. 360-361. He has tried some activities such as doing the dishes and vacuuming but
he never gets very far. R. 351. He is not able to cook or do laundry and when he goes grocery
shopping, he has to use the electric carts. R. 352. He has trouble carrying packages and is only
able to carry one or two, depending on how heavy they are. Id. He experiences intense pain
almost every day and is required to alternate between laying down and sitting up to get relief. R.
356. He is constantly shifting and has to use a cane to walk and help him get up. R. 357.

Because the medical evidence of record unequivocally established the existence of
plaintiff's physical impairments and there was no evidence undermining plaintiff's testimony, the
ALJ had an obligation to assess plaintiff's testimony concerning the limitations caused by his
impairments with reference to its consistency with the medical evidence, the effects obtained by
any treatment or therapy and any other probative evidence bearing on the ability to engage in
work-related activities. Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999). While the ALJ
did analyze plaintiff's testimony for its strengths and weaknesses in conjunction with the
evidence of record during the first few years after plaintiff's alleged onset date, during which
time there was evidence to support the notion that plaintiff experienced modest degrees of relief
from different modalities of treatment and possibly could do a limited range of sedentary work,
he did not do so with regard to growing body of evidence indicating the progression of plaintiff's
deteriorating low back impairment had rendered him disabled in later portion of the period of
time under consideration. Of course, the failure to do so was error and given the consistent body

of evidence reflecting the development of chronic pain and a significant gait disturbance during this period of time, the analysis undertaken by the ALJ cannot supply the substantial evidence needed to support the decision below.  See Taybron v. Harris, 667 F.2d 412, 415 N.6 (3d Cir. 1981) (subjective testimony concerning limitations on the ability to engage in work-related activity is entitled to great weight where it is supported by and consistent with the medical evidence of record); Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985); Kent v. Schweiker, 710 F.2d 110, 115 (3d Cir. 1983).  And this determination is only made more forceful when plaintiff's eight year effort to overcome his back injury and return to work at a light and then medium level of exertion is taken into account.

The Act describes disability as the inability to engage in substantial gainful activity by reason of a physical or mental impairment that can be expected to last for a continuous period of at least twelve months.  The ability to engage in substantial gainful employment means more than the ability to do certain of the physical and mental acts required on the job; the claimant must be able to sustain the physical and mental demands of work-related activities throughout continuous attendance in a regular work week.  Dobrowolsky v. Califano, 606 F.2d 403, 408 (3d Cir. 1979). The question thus is not whether a claimant can perform activities consistent with substantial gainful activity on any particular day, but whether the claimant has the ability to engage in work activities on a systematic and sustained basis.  Plaintiff had the burden of making out a prima facia case that he was disabled within in the meaning of the Act.  Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980); Livingston v. Califano, 614 F.2d 342, 345 (3d Cir. 1980); 20 C.F.R. § 404.1512(a).  This burden generally is met where the record clearly substantiates a claimant's subjective claim that he or she has an impairment which prevents the claimant from engaging in substantial gainful activity.  Rossi v. Califano, 602 F.2d 55 (3d Cir. 1979).  Here, the substantial evidence of record supports only the conclusion that plaintiff could not engage in such activity at least as of May 13, 2002, when Dr. Thomas indicated that the limitations from Plaintiff's

impairments prevented him from meeting the demands of substantial gainful activity on a regular and sustained basis.  Accordingly, to the extent the ALJ's findings and conclusions reflected a determination that Plaintiff was not disabled at or after that point in time they were not supported by substantial evidence.  As a result, Plaintiff's motion for summary judgment must be granted in part and the matter will be remanded to the Commissioner with direction to grant benefits consistent with an onset date of May 13, 2002.

An appropriate order will follow.

Date: September 30, 2008

s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:     Steven L. Morrison, Esquire
        1004 Harrison City-Export Road
        Harrison City, PA 15636

        Jessica Smolar
        Assistant United States Attorney